**Steven T. Wax, Oregon State Bar No. 85012**
**Federal Public Defender**
**E-Mail: Steve_Wax@fd.org**
**Ruben L. Iniguez**
**Assistant Federal Public Defender**
**Email: Ruben_Iniguez@fd.org**
**101 SW Main Street, Suite 1700**
**Portland, OR 97204**
**Tel: (503) 326-2123**
**Fax: (503) 326-5524**

**Bryan E. Lessley, Oregon State Bar No. 92081**
**Assistant Federal Public Defender**
**Email: Bryan_Lessley@fd.org**
**151 W. 7th, Suite 510**
**Eugene, OR 97401**
**Tel: (541) 465-6937**
**Fax: (541) 465-6975**

**Attorneys for Petitioner**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **AMIN ULLAH,** | |
| **Petitioner,** | **05-CV-1237-ESH** |
| **v.** | **PETITIONER'S RESPONSE TO** |
| | **MOTION FOR PROCEDURES** |
| **GEORGE W. BUSH, et al.,** | **RELATED TO REVIEW OF** |
| | **CERTAIN DETAINEE MATERIALS** |
| **Respondents.** | |

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.    THE SEIZURE OF ATTORNEY-CLIENT MATERIALS REQUIRES A
      SHOWING OF INDIVIDUALIZED CAUSE, WHICH IS NOT PRESENT
      HERE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      A.    The Government May Not Seize or Inspect Attorney-Client Materials
            Based Simply On General Allegations Pertaining To The Detainees
            As A Group; Rather, The Government Must Show That A Specific
            Detainee Has Abused The Attorney-Client Privilege . . . . . . . . . . . . . . . . 5

      B.    The Government Has Made No Showing To Justify The Seizure Or
            Review Of Any Of The Detainees' Legal Documents . . . . . . . . . . . . . . . 11

      C.    The Government's Motion Does Not Explain Why Seizure And
            Search Of Documents Is Necessary To Stop Detainees From
            Communicating In Those Camps Where Detainees Already Have The
            Ability To Communicate In Other Ways . . . . . . . . . . . . . . . . . . . . . . . . . . 15

II.   THE GOVERNMENT'S EFFORTS TO PREVENT DETAINEES FROM
      BEING ABLE TO COMMUNICATE WITH EACH OTHER IS AN
      ILLEGITIMATE PURPOSE TO BEGIN WITH BECAUSE THE GENEVA
      CONVENTION REQUIRES THAT DETAINEES BE ABLE TO
      INTERMINGLE AND COMMUNICATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

      A.    To The Extent That Association Among Detainees Is Severely
            Limited Or Prohibited, Those Conditions Violate Multiple Articles
            Of The Geneva Convention Prohibiting These Restrictions On
            Detainees' Ability To Associate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

      C.    The Geneva Convention Applies To Guantanamo Detainees . . . . . . . . 25

            1.    The Definition Of "Enemy Combatant" Does Not Distinguish
                  Between Persons Supposedly Associated With Al Qaeda
                  Versus The Taliban.  Thus The Full Geneva Convention
                  Applies To All Detainees Who Are Deemed To Be Enemy
                  Combatants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

            2.    The Petitioner Is Entitled To The Protection Of The Full
                  Geneva Convention Because He Is An Afghani, Captured

And Detained In Afghanistan, And Because Specific Allegations Or Evidence In His CSRT Or ARB Include Allegations of Association With The Taliban . . . . . . . . . . . . . . 28

3.    Article 3's Prohibition On Inhumane Treatment Prohibits Close Confinement And Requires That Detainees Be Able To Communicate And Associate . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

D.    Because Either The Geneva Convention As Whole, Or Article 3 Individually, Require That Detainees Be Permitted Regular Communication With Each Other, The Government's Attempts To Prevent Any Communication, And Its Attempts To Detect And Prevent Communication By Seizing And Reading The Detainees' Papers,  Are Unnecessary, Improper, And Serve No Legitimate Purpose . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

III.    EVEN IF THE PRIVILEGE MUST YIELD, REVIEW SHOULD BE BY A NEUTRAL PARTY RATHER THAN A GOVERNMENT FILTER TEAM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

IV.    THE GOVERNMENT HAS FINALLY SHOWN NO CAUSE FOR CREATING A FILTER TEAM TO POLICE THE ACTIONS OF HABEAS COUNSEL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

CONCLUSION AND REMEDY  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

# TABLE OF AUTHORITIES

**Page**

## SUPREME COURT CASES

*Hamdan v. Rumsfeld*,
2006 WL 1764793 (U.S. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Lanza v. State of New York*,
370 U.S. 139 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Procunier v. Martinez*,
416 U.S. 396 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Swidler & Berlin v. United States*,
524 U.S. 399 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Upjohn Co. v. United States*,
449 U.S. 383 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Zolin*,
491 U.S. 554 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

## UNITED STATES CIRCUIT COURT CASES

*Bach v. Illinois*,
504 F.2d 1100 (7th Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Carter v. Hutto*,
781 F.2d 1028 (4th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Doe v. United States*,
2003 WL. 22879314 (2d Cir. Dec. 4, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Goff v. Nix*,
113 F.3d 887 (8th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Hiney v. Wilson*,
520 F.2d 589 (2d Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*In re Grand Jury Subpoenas Duces Tecum*,
798 F.2d 32 (2d Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 32

*Johnson-El v. Schoemehl*,
878 F.2d 1043 (8th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*In re Grand Jury Subpoenas 04-124-03 and 04-124-05*,
Nos. 05-2274/2275 (6th Cir. July 13, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*In re Richard Roe, Inc.*,
68 F.3d 38 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*In re Sealed Case*,
107 F.3d 46 (D.C. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Simmons v. Dickhaut*,
804 F.2d 182 (1st Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Wright v. Newsome*,
795 F.2d 964 (11th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

## UNITED STATES DISTRICT COURT CASES

*Adem v. Bush*,
425 F. Supp. 2d 7 (D.D.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 9, 10, 18, 19

*Al Odah v. Bush*,
346 F. Supp. 2d 1 (D.D.C. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 10

*Black v. United States*,
172 F.R.D. 511 (S.D. Fla. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*In re Search of the Scranton Housing Authority*,
2006 WL. 1722565 (M.D. Pa. Jun. 22, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*United States v. Abbell*,
914 F. Supp. 519 (S.D. Fla. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*United States v. Grant*,
2004 WL 1171258 (S.D.N.Y. May 25, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Skeddle*,
989 F. Supp. 890 (N.D. Ohio 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Stewart*,
2002 WL. 1300059 (S.D.N.Y. June 11, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 31

**OTHER AUTHORITIES**

Congressional Research Service Report for Congress: Lawfulness
of Interrogation Techniques Under the Geneva Conventions (September 8, 2004) . . . . . . . . . . 30

Geneva Convention (III) Relative to the Treatment of Prisoners
Of War, August 12, 1949, [1955] U.S.T. 3316, T.I.A.S. No. 3364 . . . . . . . . . . . . . 2, 5, 17, 19-33

ICRC, 3 Commentary on the Geneva Conventions of 12 August 1949
 (Jean Pichtet, ed. 1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

International Covenant on Civil and Political Rights ("ICCPR") . . . . . . . . . . . . . . . . . . . . . 27, 29

United Nations Universal Declaration of Human Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

AMIN ULLAH,

       **Petitioner,**

  v.

GEORGE W. BUSH, et al.,

      **Respondents.**

**05-CV-1237-ESH**

**PETITIONER'S RESPONSE TO MOTION FOR PROCEDURES RELATED TO REVIEW OF CERTAIN DETAINEE MATERIALS**

Petitioner Ullah hereby urges that the Court deny the government's Motion For Procedures Related To Review Of Certain Detainee Materials, and that the Court order the immediate return to the detainee of all his personal written materials, including but not limited to, any and all attorney-client materials.

The reasons why the government's motion should be denied are as follows: (1) the government's scant factual recitation provides inadequate cause for a wholesale seizure of attorney-client materials from all detainees, without any individualized justification, given the chilling effect such seizure has on the attorney-client relationship, and given the importance of that relationship to the system of justice that the Supreme Court has recently articulated must be employed for Guantanamo detainees; (2) the seizure and reading of attorney-client material has no legitimate penological justification because its purpose is to detect whether detainees have been communicating with each other, yet detainees, at least in Camp Four, if not elsewhere, are permitted to communicate with each other by other methods; and (3) the seizure of any detainee paperwork, including both attorney-client material and general personal documents, for the purpose of stopping detainees from

communicating with each other, serves no legitimate penological interest because detainees must be able to have interpersonal communication, and not be kept in full-time close confinement, under the Geneva Convention and other fundamental principles of international law.  Thus preventing detainees from communicating, or investigating whether they have communicated in the past, is no a legitimate purpose.

## SUMMARY OF ARGUMENT

The government seized all of the personal papers, including attorney-client material as well as all other papers, from every detainee at Guantanamo, in every Camp, who has been designated an enemy combatant.  The government recites that this seizure occurred between June 14 and June 18, 2006, following three purported suicides in Camp One on June 10.  Gov. Exh. B, pp. 2-3. The government gave no advance notice to counsel or the court of its intentions, and gave no notice for almost three weeks after the fact, until filing its Motion For Procedures on July 7.

For a host of reasons, it has proven exceptionally difficult to build trusting attorney-client relationships with many detainees at Guantanamo,.  Trusting relationships are often difficult to build with persons in custody, and the usual reasons apply here.  In addition, the detainees are from multiple foreign cultures that are already in difficult relationships with the United States, do not understand our legal system or its many nuances, have been detained in harsh conditions, many of them in near total isolation, for a lengthy period of time (*Adem v. Bush*, 425 F. Supp. 2d 7, 10-11 (D.D.C. 2006)), and have been unable during that time even to see much of the evidence against them or receive a fair tribunal.  *Hamdan v. Rumsfeld*, 2006 WL 1764793*30-31 (2006)).  They have suffered long delays in getting to meet counsel even after learning that lawyers would be appointed (*Adem*, 425 F.Supp. 2d at 17, 18 n. 20)(as of March 2006, nearly a year after submitting requests for

assistance, not a single detainee had been visited by appointed counsel).[1]  Many detainees were also apparently told a variety of lies about their counsel by Department of Defense employees in a deliberate effort by those employees to undermine the attorney-client relationship. (*Adem*, 425 F.Supp. 2d at 16; *see below* at pp. 11-12).

The government's seizure of the legal paperwork from all the detainees a month ago, for which it gave no notice to anyone outside of Guantanamo for nearly three weeks, threatens to undermine the delicate attorney-client relations that the attorneys have worked, at considerable time and expense, to foster.  The government's proposal to have Department of Defense employees now read the papers threatens even greater destruction of that delicate relationship.  Having worked to gain trust, counsel are now potentially in the position of having to advise their clients that their communications are not, in fact, sacrosanct, and that all of the writings that have previously passed between them are now open for review by their captors. The nuances of a "filter team" will be lost on detainees whose trust in their attorneys is conditional to begin with and whose trust in the Department of Defense is nonexistent.  *See Adem*, 425 F.Supp. 2d at 15-18 (confusion about legal procedures; distrust of Department of Defense).

The government argues that this seizure is justified in order to  "investigate fully the circumstances surrounding the deaths of the three detainees and to determine whether other suicides were planned or likely to be planned" Gov. Mot., p. 6. The government additionally contends that review of all the detainee paperwork, including attorney-client materials, is necessary to determine

---

[1]The undersigned counsel, and others from the Federal Public Defender for the District of Oregon, were part of the first group of assigned counsel to travel to Guantanamo, in early March 2006.  These meetings were referred to in *Adem*, 425 F.Supp. 2d at 17 n. 20.

whether there is any "planning or coordination" of possible future suicide attempts.  Gov. Mot., p. 20.

Yet the government offers only a small handful of documents that show any kind of communication between detainees, only one of which apparently contains a direct reference to the apparent suicides.  Even that reference is vaguely described in the government's Motion and attachments.  Aside from that single vague reference,  the government offers no evidence to show that detainees may have communicated about the suicides.  *See below* at pp. 13-18.  The government's papers make no individual reference at all to Petitioner.

Violation of the attorney-client relationship, that is, allowing the government to penetrate it and be privy to privileged communications, requires a specific, individualized showing of need adequate to demonstrate a sufficient degree of cause.  All of that is lacking here.  There is no individualized showing sufficient to justify intrusion into the attorney-client paperwork of even a single detainee, much less all of them.

Any intrusion on the attorney-client privilege must not only be satisfied by a showing of individualized cause, but also must be shown to be necessary for a legitimate penological interest.  Here, the sole purpose of the government's desire to read attorney-client paperwork is to be able to determine whether detainees are "coordinating" or "planning."  But, to the extent that detainees already have the ability to communicate with each other freely in other respects, they could coordinate and plan, if at all, without having to resort to illicit notes on attorney-client documents.  This is at least true of Camp Four, where detainees live communally.  But in any Camp where detainees have at least a limited right and ability to interrelate and communicate, there is no

justification for allowing the government to read privileged paperwork as a way of investigating whether detainees have been communicating, because they are already permitted to.

Finally, allowing the government to read any of the detainees' paperwork, not just the attorney-client material, as a way of investigating whether they have been communicating, is an illegitimate objective because the Geneva Convention and other principles of international law require that detainees be permitted to interrelate and communicate.[2]   Indeed, with the possible exception of Camp Four, the entire Guantanamo facility, in terms of its restrictions on the ability of detainees to interrelate, and in terms of the close custody in which the detainees are held, violates the Geneva Convention and is an inhumane form of custody under other principles of international law.  Thus the government's efforts to prevent detainees from communicating with each other, and to investigate whether they have been doing so, are illegitimate to begin with.

## I.      THE SEIZURE OF ATTORNEY-CLIENT MATERIALS REQUIRES A SHOWING OF INDIVIDUALIZED CAUSE, WHICH IS NOT PRESENT HERE.

### A.      The Government May Not Seize or Inspect Attorney-Client Materials Based Simply On General Allegations Pertaining To The Detainees As A Group; Rather, The Government Must Show That A Specific Detainee Has Abused The Attorney-Client Privilege.

Prison officials may not read or review attorney-client materials, even those in the hands of detainees, absent a showing of individualized cause.  The attorney-client privilege is "the oldest of the privileges for confidential communications known to the common law." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981).  Its purpose is to "encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance

---

[2]The term "Geneva Convention" in this pleading is a reference to the Geneva Convention (III) Relative to the Treatment of Prisoners Of War, August 12, 1949, [1955] U.S.T. 3316, T.I.A.S. No. 3364; *see Hamdan v. Rumsfeld*, 2006 WL 1764793*10 (U.S., June 29, 2006).

of law and administration of justice." *Swidler & Berlin v. United States*, 524 U.S. 399, 403 (1998); *see also Lanza v. State of New York*, 370 U.S. 139, 143-44 (1962) ("[I]t may be assumed that even in a jail, or perhaps especially there, the relationships which the law has endowed with particularized confidentiality must continue to receive unceasing protection"). As this Court has recognized in the context of the Guantanamo litigation, "[t]he privilege that attaches to communications between counsel and client has long held an exceptional place in the legal system of the United States." *Al Odah v. Bush*, 346 F. Supp. 2d 1, 10 (D.D.C. 2004).

Nowhere is the effectuation of the privilege more important than in the context of pre-trial detention. "An inmate's need for confidentiality in his communications with attorneys through whom he is attempting to redress his grievances is particularly important." *Bach v. Illinois*, 504 F.2d 1100, 1102 (7th Cir. 1974); *see also Johnson-El v. Schoemehl*, 878 F.2d 1043, 1051 (8th Cir. 1989) ("Pretrial detainees have a substantial due process interest in effective communication with their counsel and in access to legal materials. When this interest is inadequately respected during pre-trial confinement, the ultimate fairness of their eventual trial can be compromised"). For such prisoners, "contact with an attorney and the opportunity to communicate privately is a vital ingredient to the effective assistance of counsel and access to the courts." *Bach*, 504 F.2d at 1102. Even for prisoners convicted of crimes, the Supreme Court has held, "[r]egulations and practices that unjustifiably obstruct the availability of professional representation or other aspects of the right to access to the courts are invalid." *Procunier v. Martinez*, 416 U.S. 396, 419 (1974).

Seizure of legal papers is particularly egregious because it strikes at the heart of the attorney-client relationship and interferes with the inmate's access to the courts. "The taking of legal papers will often (though perhaps not always) interfere with an inmate's right of access to the courts….

Page 6    PETITIONER'S RESPONSE TO MOTION FOR PROCEDURES RELATED TO REVIEW OF CERTAIN DETAINEE MATERIALS

[T]he destruction or withholding of inmates' legal papers burdens a constitutional right, and can only be justified if it is reasonably related to a legitimate penological interest."*Goff v. Nix*, 113 F.3d 887, 892 (8th Cir. 1997) (internal citations omitted); *see also Simmons v. Dickhaut*, 804 F.2d 182, 183–84 (1st Cir. 1986); *Wright v. Newsome*, 795 F.2d 964, 968 (11th Cir. 1986); *Carter v. Hutto*, 781 F.2d 1028, 1031–32 (4th Cir. 1986); *Hiney v. Wilson*, 520 F.2d 589, 591 (2d Cir. 1975).

This Court has recognized that Petitioners – who have not been tried and who seek the opportunity through their counsel to challenge the basis of their detention – have a right to counsel and are entitled to a confidential relationship with their counsel. *Al Odah*, 346 F.Supp.2d at 5. This Court found "that Petitioners are entitled to be represented by counsel." *Al Odah*, 346 F. Supp. 2d at 5. Thus, "the Court determine[d] that the government is not entitled to unilaterally impose procedures that abrogate the attorney-client relationship and its concomitant attorney-client privilege covering communications between them." *Al Odah*, 346 F. Supp. 2d at 5. Yet the government has decided, in the teeth of this decision, to do exactly what *Al Odah* prohibited – "to unilaterally impose procedures that abrogate the attorney-client relationship and its concomitant attorney-client privilege covering communication between them." *Al Odah*, 346 F. Supp. 2d at 5.

To give meaning to the attorney-client privilege in this context, the Court implemented Access Procedures which created avenues of confidential communication between detainees and their attorneys by laying the ground rules for in-person meetings, and for written communication between these parties. The government sought the ability to monitor these communications, but that request was squarely rejected by the Court.

The government's actions here are a plain violation of the terms of the Protective Order and accompanying Access Procedures. The government does not attempt to justify its actions under the

Protective Order, but rather admits that the seized materials "will likely include some number of attorney-client communications potentially subject to attorney-client privilege." Gov. Mot., p. 9. The government made no pre-seizure request, either *ex parte* or with notice, requesting leave to violate the Protective Order, and did not even notify the Court or counsel until nearly three weeks after the seizure.

But the government's unilateral abrogation of the privilege would have been unlawful even if it had not directly violated a Court order. Abrogation of the attorney-client privilege in any context requires the government to make a specific, *individualized* showing that there is sufficiently compelling justification for invading the privilege. For example, the government attempts here to invoke the crime-fraud exception to the attorney-client privilege as a justification for seizing and reviewing the attorney-client paperwork. Gov. Mot., pp. 15-16. But the government ignores the fact that, under the crime-fraud exception, it bears the burden of making an adequate showing that the exception applies – i.e., that *that* particular client "made or received the otherwise privileged communication with the intent to further an unlawful or fraudulent act," and actually carried out that act. *In re Sealed Case*, 107 F.3d 46, 49 (D.C. Cir. 1997); *see also Doe v. United States*, 2003 WL 22879314 (2d Cir. Dec. 4, 2003) (reversing contempt order where government failed to meet burden of showing that crime-fraud exception applied); *In re Richard Roe, Inc.*, 68 F.3d 38, 40 (2d Cir. 1995) (requiring a showing of probable cause to believe that a crime or fraud has been attempted or committed and that attorney-client communications were used to further that crime or fraud); *In re Grand Jury Subpoenas Duces Tecum*, 798 F.2d 32, 34 (2d Cir. 1986) (reversing civil contempt order because the government did not satisfy its burden of showing that the crime-fraud exception applied to the documents the corporation failed to produce). Similarly, when the government seizes

materials from a location that likely contains privileged papers, that seizure must be supported by probable cause and a warrant, and it still must employ appropriate means of screening out privileged materials. *See, e.g., United States v. Stewart*, 2002 WL 1300059 (S.D.N.Y. June 11, 2002).

The government has not cited any cases that suggest the privilege may be invaded without an *individualized*, sufficiently rigorous showing that the materials of a particular client or particular attorney are likely to have been abused in furtherance of a crime. *See, e.g.*, *United States v. Skeddle*, 989 F. Supp. 890, 894 (N.D. Ohio 1997) (permitting review of attorney-client materials "[i]n light of the finding of probable cause that had preceded the issuance and execution of the warrant"); *United States v. Grant*, No. 04 CR 207, 2004 WL 1171258, at *2 (S.D.N.Y. May 25, 2004) (documents "seized pursuant to a valid warrant, which was based upon a [judicial] finding of probable cause"). Even when such documents will be reviewed *in camera* by the court – and not by the government – "the judge should require a showing of a factual basis adequate to support a good faith belief by a reasonable person that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies." *United States v. Zolin*, 491 U.S. 554, 572 (1989) (quotations and citations omitted).

The seizure of the Guantanamo detainees' papers, and the prospect of their being reviewed by the government, chills the attorney-client relationship perhaps to an even greater extent than in a more traditional prison context. The reason is that there is a well-documented mistrust by many Guantanamo detainees of the actions of the United States government, presenting even greater than usual problems for attorneys to gain a trusting relationship. In *Adem*, this Court described the observations of one detainee who was quoted as saying "the authorities at Guantanamo have deceived the prisoners so consistently and so often" that the detainees do not trust anything they are

told by their captors.  *Adem*, 425 F.Supp.2d at 16. There have also been other public accusations of direct interference by Guantanamo officials with the attorney-client relationship.  For instance, one reported incident involved interrogators asking prisoners "did you know your lawyers are Jews?" and warning prisoners that they would never be released if they retained counsel.  *See* Davies, *U.S, Interrogators Accused Of Trying to Divide Detainees, Attorneys*, http://www.commondreams.org/headlines05/0513-04.htm.  Other reported incidents include telling detainees that detainees with lawyers would not be released, that their lawyers were liars, or that the military knows everything they say to their lawyers.  *See* Savage, *Guantánamo Detainees Find Fault with Lawyers*, Boston Globe, Aug. 10, 2005, http://www.boston.com/news/nation/washington/articles/2005/08/guantanamo_detainees_find_fault_with_lawyers/.

Not only is the attorney-client relationship made more difficult by dishonesty toward the detainees by the government, and deliberate attempts by the government to interfere with the attorney-client relationship, but also the relationship between counsel and the detainees is made more difficult by the passage of time without apparent result.  In March 2006, this Court noted the deleterious effect on the attorney-client relationship by the passage of time.  *Adem*, 425 F.Supp. 2d at 17; *see also Al Odah*, 346 F. Supp. 2d at 12 (before counsel met petitioners, they had "been detained virtually incommunicado for nearly three years without being charged with any crime").

The attorneys having painstakingly struggled to overcome these hurdles to build a trusting relationship, explain the complexities of the litigation, and engage in meaningful interchange with their clients.  The government has now unilaterally seized all the detainees' paperwork, including their legal documents, and proposes to advise the detainees that the government will read them,

based on a minimal set of generalized allegations.  The chilling effect on the attorney-client relationship caused by the seizure alone cannot yet be measured, much less the effect that allowing the government to keep and read the documents.  No legal authority allows the government to engage in wholesale inspection of the content of legal papers in the possession of inmates, and it should particularly not be allowed here, given the incalculable adverse impact it would have on counsel's ability to represent these detainees.

**B.    The Government Has Made No Showing To Justify The Seizure Or Review Of Any Of The Detainees' Legal Documents.**

Not only must the government make an individualized showing in order to be able to inspect any given detainee's paperwork, but the government's Motion fails to show any adequate reason why any detainee's legal papers should be read, or any justification for seizing any of them in the first place.

As noted above, the government's Motion rests almost completely on its stated desire to "investigate fully the circumstances surrounding the deaths of the three detainees and to determine whether other suicides were planned or likely to be planned" Gov. Mot., p. 6. The government additionally contends that review of all the detainee paperwork, including attorney-client materials, is necessary to uncover any "planning or coordination" of possible future suicide attempts.  Gov. Mot., p. 20.

But only one item in the government's factual recitation relates in any way to the apparent suicides, and even that reference is so vague that it provides no justification to seize and read anything.  No other document or item, based on the government's showing, shows any attempt by any detainee to coordinate anything.  Several of the documents found in a detainee's cell, which the

government puts forward as evidence of some kind of wrongdoing, may be perfectly legal for the detainees to have in their possession.

Taking the documents in order, the government's first assertion is that, in the mesh wall of one deceased detainee's cell, the government found a note which the government claims was written by someone other than the detainee. Gov. Mot., p. 5. This note was on a piece of paper which was stamped on the back as an attorney-client document. The government's Motion and accompanying affidavit do not describe the contents of the note, except to state that it was "related to the suicides." Gov. Mot., p. 5; Gov. Exh. B., p. 1. The government's Motion papers do not have the note or the translation attached, do not quote from it, and do not state whether the writer of the note was encouraging, discouraging, or taking any other position about the suicides. The government's papers do not say whether the note was a simple expression of regret or farewell.

The government does not say whether the writer of the note showed any knowledge that more than one suicide was being contemplated. Indeed, although the Motion and supporting materials state that the note was found "in the mesh wall of the deceased detainee's cell," they do not say whether this was a mesh wall common with any other detainees and, if so, do not say whether the note was written by the neighbor in the next cell. From this scant information, the government seeks to justify seizing and reading all the paperwork in the possession of every enemy-combatant detainee in every Camp in order to investigate the circumstances of the suicides in Camp One and the possibility of any future suicides.

Yet this note, scant as it was in reference to the suicides, was the only article found by the government in its seizure and review of the documents that apparently had any reference to the suicides. Taking the next assertion about documents, the government claims to have found, in a cell

in the same block as at least one of the apparent suicides, documents containing handwritten notes by two of the deceased detainees, also on paper stamped as attorney-client material. Gov. Mot., p. 6; Gov. Exh. B, p. 2. The government vaguely asserts that these papers "were considered to be relevant to the investigation," but does not say what the relevancy supposedly is. Gov. Exh. B, p. 2. Neither these notes nor any translation of them is included with the Motion papers, and the contents, or even a summary of the contents, are not mentioned. Presumably, if these notes had any reference to the suicides, the government's Motion would have stated as much; thus the assumption which this court should make is that they did not. They then cannot in any way provide a basis on which to seize and read the paperwork of every detainee in every Camp as part of an investigation into the suicides.

In the cell of another detainee in an unspecified camp, the government found a document purportedly describing how to tie knots, an internal JTF-Guantanamo generated e-mail, and, in an attorney-client envelope, a typed document with an "FOUO" designation and another document which had previously been stamped "Secret" on which that word had been lined through and the word "Unclassified" added. The Motion does not say what Camp these things were found in, nor does it explain what relevance these materials have to an effort to "investigate fully the circumstance surrounding the deaths of the three detainees and to determine whether other suicides were being planned or were likely to be planned." Gov. Mot., p. 6.

Several things in particular need to be said about these last documents. First, detainees may legitimately be in possession of documents bearing the designation "FOUO," and the government's Motion does not explain why this document provides any basis whatever for a search or seizure. "FOUO" or "For Official Use Only" stamps are *not* classification designations; documents so-

labeled are not necessarily sensitive in any manner. "FOUO" is nothing but an internal Department of Defense designation whose purpose is to determine whether a particular document may be released to the public under the Freedom of Information Act. "The abbreviation 'FOUO' is used to designate *unclassified* portions that contain information that may be exempt from mandatory release to the public under [FOIA] … ." DoD Regulation 5200.1: C5.2.7.1.1.3 (emphasis added). The designation is specifically "not authorized as an anemic form of classification to protect national security interests" (*Id.* 5400.7-R: C4.1.1) and in fact "is, by definition, unclassified." *Id.* AP3.2.2.3.2. The Protective Order does not prevent prisoners from being in possession of FOUO documents; such documents by definition represent no security risks, and there is therefore no reason why a prisoner should not legitimately be in possession of such documents, whether in an attorney-client envelope or anywhere else.

Second, the government's Motion does not describe what is illicit about the document marked with a crossed-out "SECRET." As with all the other documents on which the government bases its Motion, the Motion does not include a copy of the document with the "SECRET" designation crossed out, so it is impossible to respond with certainty about what it is. But Petitioner's Exhibit A, attached hereto, includes a page from the unclassified factual return in *Chaman v. Bush*, CV 05-887-RWR, in which someone has lined out the word "Secret" at the bottom of the page, and several more pages where someone has handwritten the word "Unclassified." Based on counsel's experience and observation in these cases, seeing such pages is not unusual. The Protective Order does not prevent prisoners at Guantánamo from possessing unclassified documents, and there is therefore no reason why a prisoner should not legitimately be in possession of a document in which the word "Secret" is crossed out and the word "Unclassified" added. The

government's Motion simply does not explain why this document should not be legitimately in the hands of the detainee in whose cell it was found.

Third, the so-called "knot-tying" document found by the government is similarly not attached to the Motion, and is only generally characterized. It was not purported to have been labeled "attorney-client material" and is not alleged to have been discovered in a prisoner's privileged legal folder. Petitioner does not accept the government's characterization of it as illicit, or as containing "instructions on tying knots," in the absence of production of the actual document.

Finally, the government does identify a single document that – from the government's description of it – likely should not have been in the possession of a prisoner. This document is an email from JTF-Guantánamo itself. Gov. Mot., p. 5. The government does not allege that this document was given to this detainee by another detainee or that it demonstrates any kind of communication among detainees. It was also not found amongst the detainee's legal materials. While it may be that JTF-Guantánamo had some form of security breakdown of its own, this apparent security breakdown provides no justification for seizing and searching the legal paperwork of every enemy-combatant detainee in the prison.

**C.    The Government's Motion Does Not Explain Why Seizure And Search Of Documents Is Necessary To Stop Detainees From Communicating In Those Camps Where Detainees Already Have The Ability To Communicate In Other Ways.**

Although the government's Motion asserts that the seizure and review of all attorney-client paperwork is necessitated by legitimate security concerns (Gov. Mot., pp. 13-15), or more precisely, by "legitimate penological interests," the final failure in the government's showing is based on the underlying premise of the Motion – that seizure and review of all these documents, including both the attorney-client and general documents in each detainee's possession – is necessary in order to

assure that detainees are not passing papers between themselves in order to communicate. The stated purpose of the seizure and reading of the documents is the need to investigate "whether a coordinated plan existed for the suicides involving the encouragement, assistance or direction of other detainees or individuals, as well as the existence of any other plots or plans for additional detainee suicides" (Gov. Mot., pp. 8, 13, 15), but what this amounts to is nothing more and nothing less than an investigation to determine whether inmates have been communicating with each other by passing papers. Indeed, as noted above, the government has identified only one paper that even makes reference to the suicides.

As part of this concern with the illicit passing of papers, the government additionally argues that detainees have used attorney-client documents for the communication of such plots to shield the improper communication from Camp officials who do not review attorney-client documents. Gov. Mot., pp. 8, 13.

But the government does not explain how seizure and review of the paperwork would prevent coordinated detainee activity or communication among detainees who, because of the Camp they are confined in, have the ability to communicate with each other without any need to resort to surreptitious means. The website of the organization GlobalSecurity.org describes the basic conditions existent at each of the Camps making up the Guantanamo Bay detention facility. Camp Four is described as having communal living rooms housing up to ten detainees each, with a common shower that serves the whole Camp. *See* http://www.globalsecurity.org/military/guantanamo-bay_dela.htm, p. 4. Each living area has common recreational areas for detainees to play team sports, board games and cards, to which they have access seven to nine hours per day. *Id.* Detainees in Camp Four also have access to a soccer

field and a volleyball court.  The detainees eat together in their cell block.  They also receive visits from a librarian who provides reading materials.  *Id.*

The government's Motion does not discuss what possible justification there can be for reading the legal paperwork of detainees in Camp Four in order to determine whether they are "coordinating" or "planning" through surreptitious use of their legal paperwork.  These detainees live together in a communal setting where they have virtually unlimited interaction with each other.  No "legitimate penological interest" could possibly exist to justify the government reading their legal paperwork to determine whether they are communicating with each other given that they have unfettered communication 24 hours per day.

Notably, the government's Motion references an incident at Camp Four in May 2006, when ten detainees in one of the bunkhouses engaged in a "melee" with prison guards.  Gov. Mot., pp. 4, 6 n. 6.  But the government does not explain how reading these detainees' attorney-client documents would help prevent such incidents, given that these detainees live communally and hardly needed to utilize paperwork to communicate about such activities.

Other Camps have the same issues to the extent they allow detainees to exercise together, attend common worship gatherings, or otherwise interact.  As will be discussed in the next section below, the Geneva Convention requires that detainees be permitted to interact in these ways, meaning that the government cannot have any legitimate interest in preventing them from intermingling and communicating.  But to the extent any of these Camps already allow intermingling and communication, then any legitimacy to the government's assertion that it must read legal paperwork to investigate possible communication disappears.

There are also documented, legitimate instances when detainees have been in possession of paperwork written by other detainees, undercutting any claim by the government that the discovery of such items gives cause to seize and search the detainees' paperwork. Indeed, many of the detainees would never have filed habeas corpus petitions had it not been for their ability to help each other prepare their petitions. In *Adem*, this Court described how some of the detainees apparently only filed for habeas corpus because of advice and assistance from other detainees:

> However, Al-Rawi believed that the only reason the Afghani detainees were able to send letters to the Court is because one of the Afghani detainees spoke some English and because these particular detainees were held in a group setting.... According to Al-Rawi, the Afghani detainees discussed the DoD notice and wrote their letters to the Court as a group.... However, this kind of collective action "cannot happen in other blocks because the prisoners cannot easily speak as a group to discuss their options for challenging their detention."

*Adem*, 425 F.Supp. 2d at 16. The Court also described how Mr. Al-Rawi himself was instrumental in helping other detainees file petitions or communicate the desire for counsel:

> Al-Rawi, who speaks English, and who is himself represented by counsel, offered to help other detainees file a *habeas* petition because the DoD notice "specifically said that he could." Al-Rawi claims that he knows Adem personally because they lived together for some period of time in Camp Delta. Adem specifically asked Al-Rawi to help him get a lawyer. Several other detainees did the same. Al-Rawi sent a letter to Mr. Mickum, his own lawyer, listing the names of the detainees who had come to him asking for help in getting a lawyer. Al-Rawi listed Adem's name, his ISDN number and his home country (Sudan). He also noted that Adem had attempted to write directly to Mr. Mickum, but the letter apparently never arrived.
>
> According to Al-Rawi, when he "gave his attorney authorizations from other detainees, he was conveying 'their words, their wishes.' " Adem and other detainees sought help from Al-Rawi because he had a lawyer whom he trusted and also because he spoke English and could help translate detainees' requests for a lawyer.

*Adem*, 425 F.Supp.2d at 17-18 (citations to the case record and footnote omitted).

Mr. Al-Rawi and others like him, who provided this service to other detainees, necessarily found themselves in possession of papers with other detainees' handwriting just as other detainees

almost certainly had possession of papers containing his.[3]  This was perceived by the *Adem* Court as not merely legal, but desirable in vindicating the rights of these detainees.  The fact that the detainees have legal means of communicating with each other undercuts – indeed, shatters – the government's claim that it has some "legitimate penal objective" in seizing and reading inmate papers, including legal papers, in order to prevent them from communicating.

Far from making an individualized showing of need to justify seizing and reading legal paperwork, the government's Motion ignores the simple fact that the measure it wants to take would put an extraordinary chill on the already delicate, but essential, trust between the detainees and their counsel, while accomplishing nothing whatsoever to stop them from communicating at one, if not more, of the Camps.  All of the government's justification for such a step is, as noted above, supported by assertions of fact that do not even remotely show any connection between the seizure of the legal papers and the investigation or prevention of suicide.

## II.    THE GOVERNMENT'S EFFORTS TO PREVENT DETAINEES FROM BEING ABLE TO COMMUNICATE WITH EACH OTHER IS AN ILLEGITIMATE PURPOSE TO BEGIN WITH BECAUSE THE GENEVA CONVENTION REQUIRES THAT DETAINEES BE ABLE TO INTERMINGLE AND COMMUNICATE.

The predominant purpose of the government's seizure of the detainee paperwork, and the predominant purpose of reading the papers, is to prevent detainees from being able to communicate with each other and to discover whether communication has occurred in the past.  Indeed, the repeated theme of the government's efforts to seize and read detainee paperwork is to determine

---

[3]It is also apparent, and tragic, to contemplate how many detainees were deprived of the ability to file habeas corpus petitions because they were held in Camps where they could not communicate with people like Mr. Al-Rawi.

whether the detainees are, or have been, engaging in "some level of planning or coordination." Gov.

Mot., pp. 5, 8, 13, 15, 16-17, 20.

The problem with this premise is that the Geneva Convention requires that prisoners be

allowed to communicate with each other in ways far exceeding the passing of notes. Indeed, the

manner in which the government is detaining the prisoners at Guantánamo Bay, including the

extreme measures to limit or preclude communication among them, violates multiple provisions of

the Geneva Convention, with the possible exception of Camp Four. The government's seizure of all

the paperwork, including personal as well as legal documents, should be disallowed because its very

premise – that the government has the right to stop detainees from communicating – violates the

Geneva Convention and other established principles of international law.

> **A.    To The Extent That Association Among Detainees Is Severely Limited
> Or Prohibited, Those Conditions Violate Multiple Articles Of The
> Geneva Convention Prohibiting These Restrictions On Detainees' Ability
> To Associate.**

Looking first to the description of the various camps at Guantanamo, as described on the

GlobalSecurity.org web page, the maximum security exists at Camp Three, described as follows:

> Cells are 6 ft. 8 in. by 8 ft., with a squat-style toilet, a metal sink and a sleeping berth
> affixed to green steel-mesh walls. Detainees are allowed to exercise for about 30
> minutes, three times a week, in a small exercise area. They are not allowed to
> exercise with others. They are also not allowed to have a roll of toilet paper. They
> have to ask a guard to give them an appropriate size piece when they need it. Camp
> 3 hold (sic) about 10% of the total detainees at Camp Delta.[4]

*See* http://www.globalsecurity.org/military/facility/guantanamo-bay_delta.htm, p. 3. Camp Two is

the next most secure, with the same cells, the same exercise limitations (including that the exercise

must be alone), and the same limitations on toilet paper. *Id.* Detainees at Camp Two may have

---

[4]Camp Delta is the name for the detention facility and includes Camps 1, 2, 3, 4, and 5.

Page 20    **PETITIONER'S RESPONSE TO MOTION FOR PROCEDURES RELATED TO REVIEW OF
CERTAIN DETAINEE MATERIALS**

comfort items not allowed at Camp Three such as anti-dandruff shampoo and soft-plastic pens. Camp 2 holds about 9% of the total detainees. *Id.*

Camp One, the next level down in security, includes 10 cell blocks with 48 cells each. Detainees have more personal items than in Camps Two and Three, but still no toilet paper except for an appropriate sized piece when they ask for it. *Id.*, p. 4. If they behave well they are allowed to have a paper cup to drink from. *Id.* They are allowed exercise three times a week, including being permitted to kick a soccer ball with one other detainee. *Id.* They eat alone in their cells. *Id.* Camp One houses 31% of the detainees. *Id.*

Camp Five is a newer building with four wings of 12-14 individual cells each. Camp Five houses the detainees who are considered the most dangerous or who are believed to possess "the most valuable intelligence." *Id.* All cells are monitored by camera 24 hours per day. *Id.* Detainees are allowed about one hour of exercise per day. *Id.*

These conditions violate the Geneva Convention in almost every respect, especially, as most relevant here, in terms of the permitted amount of interaction between detainees. Looking at the specific provisions of the Convention, Article 21 states in relevant part:

> Subject to the provisions of the present Convention relative to penal and disciplinary sanctions, prisoners of war may not be held in close confinement except where necessary to safeguard their health and then only during the continuation of the circumstances which make such confinement necessary.

Article 22 similarly requires in relevant part:

> The Detaining Power shall assemble prisoners of wars in camps or camp compounds according to their nationality, language and customs, provided that such prisoners shall not be separated from prisoners of war belonging to the armed forces with which they were serving at the time of their capture, except with their consent.

These two Articles together require that prisoners may not be kept in solitary confinement, but rather must be kept in camps or compounds with others of their nationality, language and culture. Similarly, Article 25 refers to "dormitories of prisoners of war" and states that they must be as favorable in terms of size and general installations as those used for forces of the Detaining Power. Geneva Convention, Article 25.

Every Camp at Guantánamo, with the arguable exception of Camp 4, violates these Articles of the Geneva Convention.  Most importantly for purposes of the present Motion, these  Articles, prohibiting close confinement and requiring that detainees be kept in camps or compounds with others of their language and culture, contradict entirely the government's contention that it can isolate detainees, prevent them from even passing notes to each other, and house them as it does in these Camps.  The entire premise of these portions of Articles 21 and 22 is that prisoners/detainees must be kept in camps or compounds where they have the ability to associate with others.

Other Articles of the Geneva Convention similarly require that detainees/prisoners be able to associate with each other.  Article 28 provides in relevant part:

> Canteens shall be installed in all camps, where prisoners of war may procure food stuffs, soap and tobacco and ordinary articles in daily use.  The tariff shall never be in excess of local market prices.  The profits made by camp canteens shall be used for the benefit of the prisoners; a special fund shall be created for this purpose.  The prisoners' representative shall have the right to collaborate in the management of the canteen and of this fund.

The "prisoners' representative" referenced in this Article refers to the elected representative which the prisoners have designated under Article 79.  Article 79 requires, in relevant part:

> in all places where there are prisoners of war, except in those where there are officers, the prisoners shall freely elect by secret ballot, every six months, and also in the case of vacancies, prisoners' representatives entrusted with representing them before the military authorities, the Protecting Powers, the International Committee

of the Red Cross and any other organization which may assist them.  These prisoners' representatives shall be eligible for re-election.

* * *

In all cases the prisoners' representative must have the same nationality, language and customs as the prisoners of war whom he represents.  Thus, prisoners of war distributed in different sections of the camp, according to their nationality, language or customs, shall have for each section their own prisoners' representative, in accordance with the foregoing paragraphs.

Article 80 anticipates that prisoners may decide to organize among themselves a system of mutual assistance, which should be within the province of the prisoners' representative.  Once again, this stands in direct contradiction to the government's attempts to prevent prisoners from being able to communicate with each other.  Contrary to the entire premise of the government's Motion, prisoners under the Geneva Convention are required to be allowed to communicate their mutual needs and provide for their mutual assistance.

Article 38 requires that prisoners be permitted to engage in sports and intellectual pursuits together:

While respecting the individual preferences of every prisoner, the Detaining Power shall encourage the practice of intellectual, educational, and recreational pursuits, sports and games amongst prisoners, and shall take the measures necessary to ensure the exercise thereof by providing them with adequate premises and necessary equipment.

Prisoners shall have opportunities for taking physical exercise, including sports and games, and for being out of doors.  Sufficient open spaces shall be provided for this purpose in all camps.

Geneva Convention, Article 38.

Detainees who are clerics must have the liberty to "minister freely to the members of their community."  Geneva Convention, Article 36.  Moreover, each Camp is required to have premises

for holding of religious services, and detainees must be permitted "complete latitude" to attend services at those premises.  Geneva Convention, Article 34.

The mail seizures and inspections described in the government's Motion, which the government wants this Court to ratify, violate the Geneva Convention.  Article 72, for instance, states in relevant part:

> Prisoners of war shall be allowed to receive by post or by any other means individual parcels or collective shipments containing, in particular, food stuffs, clothing, medical supplies and articles of a religious, educational or recreational character which may meet their needs, including books, devotional articles, scientific equipment, examination papers, musical instruments, sports outfits and materials allowing prisoners of war to pursue their studies or their cultural activities.

> * * *

> The only limits which may be placed on these shipments shall be those proposed by the Protecting Power in the interest of the prisoners themselves, or by the International Committee of the Red Cross or any other organization giving assistance to the prisoners, in respect of their own shipments only, on account of exceptional strain on transport or communications.

Article 73 continues, in relevant part, that in the absence of special agreements between the powers concerned (that is, the detaining power and the power from which the prisoners come), certain rules regarding collective shipments shall be applied.  But the special agreements:

> shall in no case restrict the right of prisoners' representatives to take possession of collective relief shipments intended for prisoners of war, to proceed to their distribution or to dispose of them in the interest of the prisoners.

Geneva Convention, Article 73.

The Convention permits the censorship, or the reading, of detainees' mail for security purposes.  Indeed, the Convention contemplates that such will occur.  Article 76 states that:

The censoring of correspondence addressed to prisoners of war or dispatched by them shall be done as quickly as possible. Mail shall be censored only by the dispatching State and the receiving State, and once only by each.

Geneva Convention, Article 76.

In short, the entire premise of the government's Motion, that the government has the power or right to prevent detainees from communicating with each other, is inconsistent with the Geneva Convention. The Geneva Convention anticipates free and ready exchange between prisoners within the confines of their camps, including requiring that they be kept in camps or compounds rather than close confinement, requiring that they have canteens from which they can purchase articles, requiring that they be allowed to engage in intellectual and physical pursuits together, that they be allowed to attend worship services, elect representatives, be able to receive and distribute collective shipments, which include musical instruments and sports outfits, and generally anticipates that within the area of confinement, the prisoners shall have latitude in association with others of their language, culture and nationality. The notion that their paperwork needs to be seized to discover whether they have been secretly communicating by passing notes through their individual cells is in direct conflict with the provisions of the Geneva Convention which prohibit individual cells except in cases of medical necessity and other provisions of the Geneva Convention which anticipate relatively free association of the prisoners within the confines of the prison facility.

## C.    The Geneva Convention Applies To Guantanamo Detainees.

All articles of the Geneva Convention apply to all the detainees at Guantanamo. This argument was made on behalf of the petitioners in *Hamdan*. *Hamdan* held two things with respect to the Geneva Convention. First, *Hamdan* made clear that the war against the Taliban is covered by the entire Geneva Convention because Afghanistan is a contracting party to the Convention.

*Hamdan*, 2006 WL 1764793*37.  Indeed, the Supreme Court cited a memorandum from the President agreeing that the war against the Taliban is subject to the Geneva Convention.  *Hamdan*, 2006 WL 1764793*37 n. 60.

Second, *Hamdan* held that it was unnecessary to decide whether the entire Geneva Convention applies to the war against al Qaeda because the Court held that, at a minimum, Article 3 of the Convention applies, which was sufficient to decide Mr. Hamdan's case.  *Hamdan*, 2006 WL 1764793*37. Article 3 includes the requirement that

> 1.    Persons taking no active part in the hostilities, including members of armed forces who have laid down their arms and those placed hors de combat by sickness, wounds, detention, or any other cause, shall in all circumstances be treated humanely... .

Geneva Convention, Article 3.  Finally, *Hamdan* rejected the lower court's ruling that the Geneva Conventions are not judicially enforceable.  *Hamdan*, 2006 WL 1764793*36.

### 1.    The Definition Of "Enemy Combatant" Does Not Distinguish Between Persons Supposedly Associated With Al Qaeda Versus The Taliban.  Thus The Full Geneva Convention Applies To All Detainees Who Are Deemed To Be Enemy Combatants.

Even though the government, in pleadings before the *Hamdan* Court, among other places, takes the position that al Qaeda members are not protected by the Geneva Convention to the same extent as supposed Taliban members, nothing about the enemy combatant determination process, or the conditions of confinement at Guantanamo, draws any distinction between the two.  Thus, any detainee who has been classified as an enemy combatant necessarily has been so classified under a definition that includes classification as a Taliban associate. All detainees are therefore entitled to the full protection of the Geneva Convention.

The Department of Defense has defined "enemy combatant" as

> an individual who was part of or supporting Taliban or al Qaeda forces, or associated forces that are engaged in hostilities against the United States or its coalition partners.

*Hamdan*, 2006 WL 1764793*10 n. 1 (quoting memorandum from Deputy Secretary of Defense Paul Wolfowitz Re: Order Establishing Combatant Status Review Tribunals (July 7, 2004)). Thus the determination of enemy combatant status for every single detainee includes an allegation that includes association with the Taliban.

The Geneva Convention requires that such people be treated as being covered by the Convention until a judicial determination that they are not. The various categories of prisoners of war, to whom the Convention applies, are set out in Article 4. Article 5, in turn, provides in relevant part:

> Should any doubt arise as to whether persons, having committed a belligerent act and having fallen into the hands of the enemy, belong in any of the categories enumerated in Article 4, such person shall enjoy the protection of the present Convention until such time as their status has been determined by a competent tribunal.

Geneva Convention, Article 5. Although the term "competent tribunal" is not defined in the Article, other international covenants use similar terms to refer to regularly constituted, independent courts with regular procedures including procedural protections for the detainee. For example, *Hamdan* referred to the International Covenant on Civil and Political Rights ("ICCPR") as an "international instrument" that sets out basic procedural protections. *Hamdan*, 2006 WL 1764793*39 n. 66. That Covenant states that anyone who has been deprived of liberty "by arrest or detention shall be entitled to proceedings before a court, in order that court may decide without delay on the lawfulness of his detention." ICCPR, Part III, Article 9. Similarly, Article 14(1) of the ICCPR describes "competent, independent and impartial tribunals established by law." The Basic Principles on the Independence

of the Judiciary, adopted by the Seventh United Nations Congress in 1985, refers to "ordinary courts or tribunals using established legal procedures."

In Petitioner's case, no tribunal, competent or otherwise, including his CSRT tribunal, has distinguished between association with the al Qaeda or the Taliban because the government's definition of enemy combatant includes both, without drawing a distinction. Thus all detainees held as enemy combatants under this definition must be entitled to protection of the full Geneva Convention, at least until some "competent tribunal" decides otherwise.

> **2.    The Petitioner Is Entitled To The Protection Of The Full Geneva Convention Because He Is An Afghani, Captured And Detained In Afghanistan, And Because Specific Allegations Or Evidence In His CSRT Or ARB Include Allegations of Association With The Taliban.**

Petitioner is entitled to the benefits of the full Geneva Convention, both because all of the detainees are entitled, and also because of his particular circumstances as an Afghani citizen. No factual return has been filed in his case, although Amin Ullah's counsel have asked the Court to order one. The unclassified CSRT record, which was made available to the Associated Press and obtained by counsel from the Internet, does not contain any list of specific purported allegations against him. In his CSRT testimony, which constitutes nearly the entire unclassified record, he repeatedly denies being associated with the Taliban; by implication, then, the allegations must somehow include the premise that he was acting on or in behalf of the Taliban against United States forces. Given that he is an Afghani citizen, was arrested at his home in Afghanistan on the basis of apparent suspicions, and given the limited nature of the record, Amin Ullah must be entitled to the protections of the full Geneva Convention. This is both because all of the detainees are afforded

those protections, and because, as an Afghani citizen arrested in Afghanistan, Amin Ullah is particularly entitled.

> 3.    **Article 3's Prohibition On Inhumane Treatment Prohibits Close Confinement And Requires That Detainees Be Able To Communicate And Associate.**

Article 3 of the Geneva Convention requires that all persons to whom that Article applies "be treated humanely." *Hamdan* held that, at a minimum, Article 3 of the Convention applies to Guantanamo detainees, regardless of whether the full Convention does. *Hamdan*, 2006 WL 1764793*37.

Holding prisoners in solitary confinement for years on end as a routine matter, denying them the ability to have regular association and conversation with other human beings, defies even the most basic standards of human decency. Although the Geneva Convention itself does not define the term "treated humanely," it should be noted that similar terms appear throughout the body of international law. The ICCPR states that "No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment." ICCPR, Part III, Article 7. The United Nations Universal Declaration of Human Rights contains identical language at its Article 5.

The International Committee of the Red Cross ("ICRC"), commenting on Article 3 of the Geneva Convention, has noted that holding a detainee incommunicado all by itself qualifies as inhumane treatment:

> It could not mean, it seems, solely treatment constituting an attack on physical integrity or health; the aim of the Convention is certainly to grant prisoners of war in enemy hands a protection which will preserve their human dignity and prevent their being brought down to the level of animals. Certain measures, for example, *which might cut prisoners of war off completely from the outside world* and in particular from their families, or which would cause great injury to their human dignity, should be considered as inhumane treatment.

ICRC, 3 Commentary on the Geneva Conventions of 12 August 1949 (Jean Pichtet, ed. 1960), p. 627

(emphasis added); *see also*, Congressional Research Service Report for Congress: Lawfulness of

Interrogation Techniques Under the Geneva Conventions (September 8, 2004), pp. CRS-18, 19.

> **D.      Because Either The Geneva Convention As Whole, Or Article 3 Individually, Require That Detainees Be Permitted Regular Communication With Each Other, The Government's Attempts To Prevent Any Communication, And Its Attempts To Detect And Prevent Communication By Seizing And Reading The Detainees' Papers,  Are Unnecessary, Improper, And Serve No Legitimate Purpose.**

Because the entire purpose of the government's seizure and efforts to read detainee paperwork

is to detect and stop detainees from communicating with each other, and because that purpose is

illegal, illegitimate, and contrary to every fundamental standard of basic decency, the government's

proposal to read all of the detainees' paperwork, including but not limited to their legal materials,

serves no legitimate security, or any other, function.  Reading of inmate papers by prison officials

serves no legitimate security concern if those inmates are able to communicate freely in other

unmonitored ways.  Because the government here cannot, consistent with the Geneva Convention or

any other statement of international law, keep these detainees in full-time close custody, preventing

them from associating or communicating with their fellows, then it is inappropriate to allow the

government to read their paperwork, especially their legal paperwork, under some false claim that such

reading will enhance security.  Stated differently, because the government has no interest in stopping

detainees from communicating, it has similarly no justification for trying to detect whether they are

doing it.

III.    **EVEN IF THE PRIVILEGE MUST YIELD, REVIEW SHOULD BE BY A NEUTRAL PARTY RATHER THAN A GOVERNMENT FILTER TEAM.**

Even if the government has shown sufficient basis to abrogate the attorney-client privilege, the use of a Department of Defense Filter Team is inappropriate here. As confirmed by the government's lack of case citations, courts have shown great reluctance to entrust attorney-client privileged materials to such governmental teams. Indeed, "the use of government taint teams has often been questioned or outright rejected by the courts." *In re Search of the Scranton Hous. Auth.*, 2006 WL 1722565, at *5 (M.D. Pa. Jun. 22, 2006). *See, e.g.*, *Black v. United States*, 172 F.R.D. 511, 516 (S.D. Fla. 1997) (even though government needed documents to pursue escaped fugitive, court rejected proposed "taint team" and ordered that "a United States district judge or his designee" would review documents for privilege); *United States v. Abbell*, 914 F. Supp. 519, 520–21 (S.D. Fla. 1995) (appointing special master rather than filter team to review potentially privileged documents obtained by search warrant). The Sixth Circuit recently overruled a district court's decision to permit review of potentially privileged documents by an independent government "taint team" because the review posed unacceptable risks to the attorney-client privilege. *See In re Grand Jury Subpoenas 04-124-03 and 04-124-05*, Nos. 05-2274/2275, slip op. at 6 (6th Cir. July 13, 2006). Even when such teams have been authorized, "at least three courts that have allowed for review by a government privilege team have opined, in retrospect, that the use of other methods of review would have been better." *United States v. Stewart*, No. 02 CR 396, 2002 WL 1300059, at *6 (S.D.N.Y. June 11, 2002).

To the extent that the government can make a specific, individualized showing that a particular detainee is using his attorney-client materials for improper ends, the Court at most should order that those documents be reviewed *in camera* by a judge, in the presence of habeas counsel and without government lawyers. This procedure is necessary given the fragile nature of the attorney-client

relations that exist between many Guantanamo counsel and their clients, and given the extreme distrust that many, perhaps nearly all, detainees have toward the Department of Defense. The prospect of having to advise these clients that, not only has their legal paperwork been seized, but that Department of Defense employees have been authorized by the court to read it, threatens the attorney-client relationship for many detainees in ways that may already be irreparable.

## IV.    THE GOVERNMENT HAS FINALLY SHOWN NO CAUSE FOR CREATING A FILTER TEAM TO POLICE THE ACTIONS OF HABEAS COUNSEL.

A final unacceptable aspect of the government's proposal is its suggestion that the filter team should be allowed to conduct its own review of the confiscated documents to determine whether they were properly "privileged" in nature, whether or not the documents are relevant to the NCIS suicide-plot investigation. Gov. Mot., p. 11  If the filter team determines that the documents are not privileged, the government proposes, then they will be "returned … to JTF-Guantánamo for appropriate action." Gov. Mot., p. 11. Such a review for privilege leaves "the government's fox . . . in charge of the [clients'] henhouse," with no check against the possibility that the filter team would draw "false negative conclusions" overriding legitimate claims of privilege. *In re Grand Jury Subpoenas*, slip op. at 10. The government's Motion in this respect is a patent attempt to chill attorney-client communications. In it, the government suggests that "possibly others" – *i.e.*, non-prisoners – may have participated in a "manifest abuse of the legal mail system." Gov. Mot., p. 10.

This unfounded assertion is a veiled threat to habeas counsel, designed to deter them from communicating effectively with their clients. Indeed, buried in a footnote is the government's conclusion that because counsel is prohibited "from sharing … certain types of materials with detainees … [if] prohibited materials are discovered in the course of review, the Filter Team would

not be constrained from bringing the matter to the Court's attention for appropriate action." Gov. Mot., p. 11 n. 10 .

Habeas counsel with access to classified information are aware that they work under the shadow of possible contempt and criminal actions, they have all been deemed not to be a security risk by the FBI, and they are all officers of the Court. There is no warrant for a new team of Department of Defense lawyers to begin scouring their privileged communications in order to uncover an imagined, nefarious plot to assist their clients in committing suicide.

## CONCLUSION AND REMEDY

The government has shown no justification for the seizure of all the detainees' papers, or for the government's request that government employees, even through the lens of a filter team, be permitted to review the contents of the attorney-client paperwork. The goal of detecting whether detainees have been in communication with each other is an illegitimate one to begin with, given the clear mandates of the Geneva Convention and the inhumanity of holding detainees in solitary confinement without the ability to interact and engage in normal human communication. Yet, if the detainees are permitted such communication, as they must be, and as many of them already are, then there is no legitimate justification for allowing the government access to their attorney-client paperwork. This is especially true given that the government has shown no individualized basis directed toward any detainee.

Moreover, the harm that the government's actions have already caused to the attorney-client relations of many Guantanamo detainees and their counsel cannot be calculated. More, and perhaps even greater, irreparable harm would ensue if the court were to allow, and if the detainees were to learn, that employees of the Department of Defense may review their confidential paperwork.

The only remedy which has any hope of restoring attorney-client relations would be for the court to order the immediate return of the paperwork to the detainees, and for the detainees to be made aware that it was their attorneys who made the government return it.

Dated:  July 21, 2006.

/s/ Steven T. Wax
Steven T. Wax
Attorney for petitioner Amin Ullah


/s/ Bryan E. Lessley
Bryan E. Lessley
Attorney for petitioner Amin Ullah


/s/ Ruben L. Iniguez
Ruben L. Iniguez
Attorney for petitioner Amin Ullah

PETITIONER'S EXHIBIT A

Declaration of Bryan E. Lessley
from *Amin Ullah v. Bush, et al.*, No. 05-CV-1237-ESH (D.D.C.)

Steven T. Wax, Oregon State Bar No. 85012
Federal Public Defender
E-Mail: Steve_Wax@fd.org
Ruben L. Iniguez
Assistant Federal Public Defender
Email: Ruben_Iniguez@fd.org
101 SW Main Street, Suite 1700
Portland, OR 97204
Tel: (503) 326-2123
Fax: (503) 326-5524
Attorneys for Petitioner

Bryan E. Lessley, Oregon State Bar No. 92081
Assistant Federal Public Defender
Email: Bryan_Lessley@fd.org
151 W. 7th, Suite 510
Eugene, OR 97401
Tel: (541) 465-6937
Fax: (541) 465-6975
Attorney for Petitioner

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMIN ULLAH, | 05-CV-1237-ESH |
| Petitioner, | |
| v. | DECLARATION OF BRYAN E. LESSLEY |
| GEORGE W. BUSH, et al., | |
| Respondents. | |

Bryan E. Lessley, first being duly sworn, deposes and says:

Page 1 - DECLARATION OF BRYAN E. LESSLEY

1.    I am counsel of record for the petitioners in *Chaman v. Bush, et al.*, No. 05-CV-887-RWR, and *Amin Ullah v. Bush, et al.*, No. 05-CV-1237-ESH (D.D.C.). I make this declaration in support of the Petitioner's Response To Motion For Procedures Related To Review Of Certain Detainee Materials submitted on behalf of petitioners in these and other cases arising from the confinement of detainees at Guantanamo Bay.

2.    Attached hereto are copies of four pages from the unclassified factual return filed by the Respondents in *Chaman v. Bush*, one of the cases mentioned in the preceding paragraph in which I appear as counsel. My office obtained these documents from the public files of the United States District Court for the District of Columbia after being appointed in that case, via the PACER system. Court records reflect that the factual return, containing these pages, was filed by the Respondents as part of Docket Item 8-2 on July 15, 2005. My office was appointed to represent petitioner Chaman pursuant to an Order dated October 14, 2005. To my understanding, because petitioner Chaman was unrepresented at the time the factual return was filed with the Court, an unclassified copy was supposed to have been served on petitioner Chaman at his place of confinement at Guantanamo Bay. This means that the four pages attached hereto should be located within his legal papers that the government seized between June 14 and July 18.

3.    The first page of the four attached pages includes the notation "SECRET" appearing at the bottom which has been lined through by hand. Because, to my knowledge, this lining through of the word "SECRET" was necessarily done by officials or employees

**Page 2 - DECLARATION OF BRYAN E. LESSLEY**

of the government before the document was filed with the court, this means that this document, including the handwritten lining through of the word "SECRET," was provided to petitioner Chaman in his cell at Guantanamo by the Respondents and that he possesses it legitimately.

4. The second attached page has the phrase "FOR OFFICIAL USE ONLY" appearing at the bottom, also lined though by handwriting. For the same reasons as above, this document, in this same condition, should legitimately exist within petitioner Chaman's legal papers at Guantanamo, having been provided to him by the Respondents.

5. The last two attached pages contain the word "Unclassified" handwritten at the top and bottom. For the same reasons as above, this document, in this same condition, should legitimately exist within petitioner Chaman's legal papers at Guantanamo, having been provided to him by the Respondents.

This the 20th day of July, 2006.

_____
Bryan E. Lessley
Asst. Federal Public Defender


Subscribed to and sworn before me this 20th day of July, 2006.

OFFICIAL SEAL
KIMBERLY R ELLIS
NOTARY PUBLIC--OREGON
COMMISSION NO. 376998
MY COMMISSION EXPIRES FEB 2, 2008

_____
Notary Public of Oregon
My Commission expires: 2/2/08

**Page 3 - DECLARATION OF BRYAN E. LESSLEY**

OCT. 25. 2005 10:55AM    FEDERAL PUBLIC DEFENDER    NO. 4490    P. 25/25

Case 1:05-cv-0008 RWR    Document 8-2    Filed 07/ 005    Page 6 of 20

(U) <u>Combatant Status Review Tribunal Decision Report Cover Sheet</u>

(U) This Document is UNCLASSIFIED Upon Removal of Enclosures (2) and (4).

(U) TRIBUNAL PANEL: #27

(U) ISN#: 1021

Ref: (a) Convening Order for Tribunal #27 of 9 December 2004 (U)
(b) CSRT Implementation Directive of 29 July 2004 (U)
(c) DEPSECDEF Memo of 7 July 2004 (U)

Encl: (1) Unclassified Summary of Basis for Tribunal Decision (U/ ~~FOUO~~ )
(2) Classified Summary of Basis for Tribunal Decision (S//NF)
(3) Summary of Detainee/Witness Testimony (U/ ~~FOUO~~ )
(4) Copies of Documentary Evidence Presented (S//NF)
(5) Personal Representative's Record Review (U).

(U) This Tribunal was convened on 20 December 2004 by references (a) and (b) to make a determination as to whether the detainee meets the criteria to be designated as an enemy combatant as defined in reference (c).

(U) The Tribunal has determined that Detainee #1021 is properly designated as an enemy combatant as defined in reference (c).

(U) In particular, the Tribunal finds that this detainee is a member of, or affiliated with, Hezb-I Islami (HIG) and the Taliban, as more fully discussed in the enclosures.

(U) Enclosure (1) provides an unclassified account of the basis for the Tribunal's decision. A detailed account of the evidence considered by the Tribunal and its findings of fact are contained in enclosures (1) and (2).



Colonel, U.S. Army
Tribunal President

FOR OFFICIAL USE ONLY



# Department of Defense
## Director, Combatant Status Review Tribunals

OARDEC/Ser: 8 3 9

2 9 JAN 2005

FOR OFFICIAL USE ONLY

From: Director, Combatant Status Review Tribunal

Subj: REVIEW OF COMBATANT STATUS REVIEW TRIBUNAL FOR
DETAINEE ISN # 1021

Ref: (a) Deputy Secretary of Defense Order of 7 July 2004
(b) Secretary of the Navy Order of 29 July 2004

1. I concur in the decision of the Combatant Status Review Tribunal that Detainee ISN #1021 meets the criteria for designation as an Enemy Combatant, in accordance with references (a) and (b).

2. This case is now considered final and the detainee will be scheduled for an Administrative Review Board.



J. M. McGARRAH
RADM, CEC, USN

Distribution:
NSC (Mr. John Bellinger)
DoS (Ambassador Prosper)
DASD-DA
JCS (J5)
SOUTHCOM (CoS)
COMJTFGTMO
OARDEC (Fwd)
CITF Ft Belvoir

**Memorandum**   *UNCLASSIFIED*



| To | : | Department of Defense<br>Office of Administrative Review<br>for Detained Enemy Combatants<br>Capt. Juno Jamison, OIC, CSRT. | Date 10/21/2004 |
|---|---|---|---|

From : FBI GTMO
        Counterterrorism Division
        Asst. Gen. Counsel ███████████

Subject  REQUEST FOR REDACTION OF
         NATIONAL SECURITY INFORMATION
         ██████████

      Pursuant to the Secretary of the Navy Order of 29 July 2004, Implementation of Combatant Review Tribunal Procedures for Enemy Combatants Detained at Guantanamo Bay Naval Base, Cuba, Section D, paragraph 2, the FBI requests redaction of the information herein marked[1]. The FBI makes this request on the basis that said information relates to the national security of the United States[2]. Inappropriate dissemination of said information could damage the national security of the United States and compromise ongoing FBI investigations.

  CERTIFICATION THAT REDACTED INFORMATION DOES NOT SUPPORT A DETERMINATION THAT THE DETAINEE IS NOT AN ENEMY COMBATANT

    The FBI certifies the aforementioned redaction contains no information that would support a determination that the detainee is not an enemy combatant.

    The following documents relative to ISN 1021 have been redacted by the FBI and provided to the OARDEC:

FD-302 dated 05/15/2003 (ISN ████ interview)

---

   [1]Redactions are blackened out on the OARDEC provided FBI document.

   [2]See Executive Order 12958

*/ of 2*

Exhibit___ *R2*

OCT. 25. 2005 10:45AM    FEDERAL PUBLIC DEFENDER    NO. 4491    P. 32/40

Case 1:05-cv-01237-UNA    Document 16    Filed 07/21/2006    Page 48 of 48
Case 1:05-cv-0082█RWR    Document 8-3    Filed 07/█2005    Page 17 of 18

UNCLASSIFIED

Memorandum from ████████ to Col. David Taylor
Re:  REQUEST FOR REDACTION, 10/21/2004


      If you need additional assistance, please contact
Asst. Gen. Counsel ████████████ or Intelligence Analyst

████ Intelligence Analyst █████████

-2-

UNCLASSIFIED

2 of 2