Ruben L. Iñiguez
Assistant Federal Public Defender
ruben_iniguez@fd.org
Bryan E. Lessley
Assistant Federal Public Defender
bryan_lessley@fd.org
101 S.W. Main Street, Suite 1700
Portland, Oregon 97204
503-326-2123 Telephone
503-326-5524 Facsimile

Attorneys for Petitioner

## UNITED STATES DISTRICT COURT

## DISTRICT OF COLUMBIA

| | |
|---|---|
| AMIN ULLAH, | CV 05-1237 (ESH) |
| Petitioner, | |
| v. | PETITIONER'S REPLY TO RESPONDENTS' OPPOSITION TO MOTION FOR RECONSIDERATION AND REQUEST FOR BRIEFING SCHEDULE |
| GEORGE W. BUSH, et al., | |
| Respondents. | |

On August 10, 2007, approximately one month after this Court denied Respondents' Motion to Dismiss the habeas corpus petition, Respondents filed a "Notice of Transfer," asserting that "the United States has relinquished custody of petitioner Aminullah (ISN 848) and transferred him to the control of the Government of Afghanistan." (CR 33). The Notice does not elaborate further about where Mr. Ullah is, and does not say whether the United States continues to retain either custody (the Notice simply says "control") or any measure of authority over his custody.

On August 13, 2007, three days after Respondents filed the Notice of Transfer, this Court entered a minute order stating that the case should be administratively closed and removed from the docket.  Counsel for Mr. Ullah was not given notice of the Court's intention to enter the minute order and was not provided an opportunity to be heard.  On August 16, 2007, three days after the minute order was entered, Mr. Ullah, through counsel, filed a Motion for Reconsideration.  He also requested a briefing schedule, asserting that disputed issues remain and that his continued designation as an "enemy combatant" carries potential collateral consequences which make dismissal of his petition inappropriate.  (CR 35).  Respondents oppose the Motion to Reconsider.  (CR 36).

In their opposition to the Motion for Reconsideration, Respondents claim that no manifest injustice arises from the closure of the case because: (1) this Court lacked jurisdiction in the first place; and (2) Mr. Ullah's transfer renders the case moot.  Both arguments lack merit.

I.    **THE COURT PROPERLY DENIED RESPONDENTS' MOTION TO DISMISS, AND ALLOWED THE EXISTING STAY TO CONTINUE, WHILE JURISDICTIONAL ISSUES ARE RESOLVED.  THE COURT'S JURISDICTION REMAINS UNCHANGED SINCE THE COURT ENTERED THAT ORDER.**

On April 19, 2007, Respondents filed a Motion to Dismiss the habeas corpus petitions filed by 162 prisoners at Guantanamo Bay, including Mr. Ullah.  (CR 28). Respondents urged that jurisdiction had been withdrawn by the Military Commissions Act of 2006 ( the "MCA")[1] or, alternatively, by the Detainee Treatment Act of 2005 (the "DTA"),[2]

---

[1]Pub. L. No. 109-366, 120 Stat. 2600.

[2]Pub. L. No. 109-148, tit. X, 119 Stat. 2680.

and cited numerous cases ostensibly in support of that argument. (CR 28 at 2-11). On July 5, 2007, this Court, after briefing, issued a minute order denying the Motion to Dismiss, without prejudice, in light of the Supreme Court's grant of certiorari in *Boumediene, et al. v. Bush, et al.*, No. 06-1195, and *Al Odah, et al. v. United States, et al.*, No. 06-1196. The Supreme Court is expected in those cases to address the jurisdictional arguments raised by Respondents.

Respondents' jurisdictional arguments in their current opposition pleading are largely a summary rehash of the same arguments made in support of their Motion to Dismiss, which the Court already has denied. In arguing that the Court lacks jurisdiction, Respondents cite the same statutes and cases, and make the same legal assertions that they made in their previous filing. *Compare* CR 36 at 2-5 with CR 28 at 2-11.[3] It remains the case that the Supreme Court is expected to address issues regarding the MCA in *Boumediene* and *al Odah*. It also remains the case that the various District Court judges in the District of Columbia generally have declined to dismiss habeas petitions filed by Guantanamo detainees under the MCA and DTA while *Boumediene* and *al Odah* are still pending in the Supreme Court. This Court already has done so in the instant case. Nothing has changed which should cause the Court to reconsider its previous denial of Respondents' Motion to Dismiss for lack of jurisdiction under the foregoing statutes.

---

[3] Respondents' current pleading also adds an argument that Mr. Ullah's habeas corpus petition must be dismissed because the DTA vests exclusive jurisdiction in the Court of Appeals. *See* CR 36 at 5. This, of course, is contrary to *Hamdan v. Rumsfield*, 126 S. Ct. 2749, 2762-2769 (2006), which held that the DTA did not divest the district court of jurisdiction over those habeas corpus actions filed by Guantanamo detainees which were pending when the DTA was enacted. Mr. Ullah's petition is among that class.

II.    **DISMISSAL IS NOT APPROPRIATE BECAUSE (1) RESPONDENTS HAVE NOT SHOWN THAT MR. ULLAH IS NO LONGER IN UNITED STATES CUSTODY, AND (2) EVEN IF HE IS, THERE STILL REMAINS THE POTENTIAL FOR COLLATERAL CONSEQUENCES FROM HIS DESIGNATION AS AN ENEMY COMBATANT.**

A.    **Respondents' "Notice Of Transfer" Is Not Sufficient To Establish That The United States No Longer Has Custody Over Mr. Ullah For Habeas Corpus Purposes.**

The Notice of Transfer asserts that "the United States has relinquished custody of petitioner Aminullah (ISN 848) and transferred him to the control of the Government of Afghanistan." (CR 33). Based on that assertion, Respondents argue that "the petitioner's transfer rendered the case moot, justifying its closure and removal from the docket." (CR 36 at 2).

The alleged transfer of a prisoner from custody does not moot a habeas corpus petition if the petitioner continues to suffer collateral consequences from the past detention (*see* sec. B, below). Before that issue is even reached, however, it is important to note that Respondents have not established that Mr. Ullah is no longer in "custody" for purposes of habeas corpus jurisdiction. Mr. Ullah's current whereabouts are not known to counsel. Other than Respondents' representation that the United States has transferred him to "the control" of the Government of Afghanistan, neither counsel nor this Court has been provided any evidence to substantiate the assertion that Mr. Ullah has departed Guantánamo Bay or arrived in Afghanistan. Counsel have reason to suspect, but have not yet been able to confirm, that Mr. Ullah remains imprisoned in Afghanistan. *See* Slate article dated August 16, 2007 ("Why is the U.S. stashing detainees at Policharki prison in Afghanistan?"), attached hereto as Exhibit A.

Even if one credits Respondents' unsupported assertion that Mr. Ullah has been transferred to "the *control* [as opposed to "the custody"] of the Government of Afghanistan" (CR 33 at 1 (emphasis added)), the question still is whether he remains "in custody under or by color of the authority of the United States." 28 U.S.C. § 2241(c)(1). If, in fact, Mr. Ullah remains in the custody of the United States, or by color of the authority of the United States, despite his presumed physical relocation to Afghanistan, this Court would continue to retain jurisdiction, or at least, the Court's continued jurisdiction would be an unsettled matter of law which may depend in part on factual issues not yet developed.

The current record is not sufficiently developed for this Court to determine whether Mr. Ullah remains sufficiently under the custody or control of the United States for habeas corpus jurisdiction to exist. In *Abu Ali v. Ashcroft*, 350 F. Supp. 2d 28 (D.D.C. 2004), this Court analyzed whether a habeas petitioner, a United States citizen, was in actual or constructive custody of United States, as required for habeas jurisdiction, if his ongoing detention by the Saudi Arabian government was at the behest and direction of the United States. In rejecting the government's assertion that jurisdiction was lacking because the petitioner was "being held by a foreign custodian," 350 F. Supp. 2d at 40, the district court disagreed with the suggestion that judicial review could be evaded "by choosing where [a petitioner] will be detained or who will detain him," *id.*, rejected the "attempt to read a requirement that the individual be in the actual physical custody of the United States," *id.* at 47, and ultimately denied the government's motion to dismiss the petition. In the end, Judge Bates found no basis "for denying jurisdiction merely because the executive is allegedly working through the intermediary of a foreign ally." 350 F. Supp. 2d at 49.

In *Abu Ali*, the petitioner was a United States citizen. Although Mr. Ullah obviously is not, the Supreme Court has left unsettled the issue of whether habeas corpus jurisdiction extends to non-citizens in the custody of the United States in foreign countries. This Court cannot resolve that issue without further factual development concerning where Mr. Ullah is, and under what circumstances and whose authority, custody, and control.

In holding that non-citizen detainees at Guantanamo have the right to file habeas corpus petitions under 28 U.S.C. § 2241, the Supreme Court did not address whether non-citizens who are detained by the United States in other locations outside the United States have the same right. Certain language in the *Rasul* decision suggests that detainees in that situation do have the right of habeas corpus. *Rasul v. Bush*, 542 U.S. 466, 484 n. 13 (2004) (detainees alleging that they have been held for years despite having engaged in no combat or terrorism against the United States "unquestionably describe 'custody in violation of the Constitution or laws of the United States'") (quoting 28 U.S.C. § 2241(c)(3)). As discussed in *Abu Ali*, 350 F. Supp. 2d at 43-44, a significant part of the discussion in *Rasul* was directed toward the issue of whether the presence of the petitioner outside the territorial jurisdiction of a federal district court was an "invariable prerequisite" to habeas corpus jurisdiction. *Rasul* decided that it was not. *Rasul*, 542 U.S. at 483. Commentators also have recognized that the question of habeas corpus jurisdiction over non-citizens detained overseas by the United States as unresolved by *Rasul*. *See* Fallon and Meltzer, *Habeas Corpus Jurisdiction, Substantive Rights, And The War On Terror*, 120 Harv. Law. Rev. 2029, 2056 (*Rasul* "failed to make clear" whether habeas corpus rights extended for non-citizens held by the United States in other locations in the world); David A. Martin,

*Offshore Detainees and the Role of Courts After Rasul v. Bush:  The Underappreciated Virtues of Deferential Review*, 25 B.C. Third World L.J. 125 (2005).

The complex question of whether habeas corpus jurisdiction extends over aliens held outside the United States is also effected by statutory changes in 28 U.S.C. § 2241 affected by the DTA and MCA, both of which attempt to limit jurisdiction.  Among the many open questions left by *Rasul* and other successive cases is the extent to which aliens detained by the United States may have constitutional rights to challenge their detention, in addition to statutory rights, as well as whether the statutory changes made by the DTA and MCA violate the United States Constitution.  It is beyond the scope of this pleading to provide an exposition of those thorny issues.  The point for the moment is that this Court should not dismiss Mr. Ullah's petition on the current record, without knowing more about his custody and status.  That the Supreme Court in *Boumediene* and *al Odah* also may address issues concerning the rights of non-citizen detainees under the Constitution is yet another reason why this action should be stayed rather than dismissed.

Also unaddressed in the current record is the issue of whether Mr. Ullah's transfer from Guantanamo one month after the Court denied Respondents' Motion to Dismiss may be an attempt to defeat jurisdiction.  In short, the current state of the record in this case, as well as the unsettled state of the law, simply does not permit dismissal of the habeas corpus petition.

**B.    The Court Should Resolve The Question Of Whether Mr. Ullah Was Unlawfully Detained For Almost Five Years Despite The Fact That He Is Not And Never Was An Enemy Combatant.**

Respondents finally contend that there are no collateral consequences flowing to Mr. Ullah from his continuing designation as an "enemy combatant" which would warrant

continued jurisdiction. (CR 36 at 5-9). Transfer of a habeas petitioner does not moot his case. *Carafas v. LaVallee*, 391 U.S. 234, 239-40 (1968) (habeas case is not moot if a petitioner, although released from custody, faces sufficient repercussions from his allegedly unlawful punishment). The designation of "enemy combatant" status is potentially more serious than a felony conviction. *Cf. Carafas*, 391 U.S. at 237 (describing the consequences of the petitioner's felony convictions, including disqualification from voting, engaging in certain business, and serving as a juror). The stigma of being labeled as an "enemy combatant" may subject Mr. Ullah to life-threatening personal and/or state-sponsored retaliation and other consequences such as restricting his ability to renter the United States or travel freely abroad.

Respondents equate the continuing stigma of being labeled an "enemy combatant" as the equivalent of having a damaged reputation. Opposition at 7. They also complain that Mr. Ullah has not met the burden of showing what the adverse collateral consequences of being labeled an enemy combatant are. *Id.* at 7-8.

Respondents' argument ignores the practical reality of the situation in which they have placed Mr. Ullah. There is no line of precedent expounding on the collateral consequences of being labeled an "enemy combatant" because the category did not heretofore exist until it was hastily created in 2004 by the Department of Defense – *i.e.*, by Respondents themselves – after the Supreme Court decided *Rasul*. The enemy combatant designation is a creature of neither statute nor regulation. Rather, it was created in a series of Orders and memoranda between the Deputy Secretary of Defense and the Secretary of the Navy on July 7, 2004, and July 29, 2004, several years *after* Mr. Ullah was initially detained. *See* Memorandum from Deputy Secretary of Defense Paul

Wolfowitz re: Order Establishing Combatant Review Stats Tribunal (July 7, 2004), available at http://www.defenselink.mil/news/Jul2004/d20040707review.pdf, cited at *Hamdan*, 126 S. Ct. at 2761 n. 1.

Because of its recent creation, and because the "enemy combatant" designation exists only as a result of the actions of the Department of Defense, Mr. Ullah is hardly in a position to list, or even to know, all of the serious collateral consequences that would befall him if the Court were to dismiss his habeas corpus action without according him the opportunity to rid himself of the wrongful designation.  Respondents here put him in a impossible position – having created a category of persons heretofore nonexistent, and having placed him in that category over his strenuous objection (after having detained him without charge or evidence for five years), they now argue that he, and not they, should shoulder the burden of demonstrating all the disabilities he will suffer if the designation remains.

Some of the harms are extremely predictable and not speculative.  It is highly likely that his continued designation as an enemy combatant, even after being released, will result in Mr. Ullah being unable to apply for admission to the United States. A habeas corpus petition is not rendered moot by the petitioner's transfer out of the country if ineligibility for admission is a collateral consequence. *Leitao v. Reno*, 311 F.3d 453, 456 (1st Cir. 2002) (bar on readmission of a removed alien is a legally cognizable collateral consequence that preserves a live controversy even after deportation of the petitioner); *Chong v. District Director,* INS, 264 F.3d 378, 385-86 (3d Cir. 2001) (10-year bar on readmission of removed alien into the United States is a sufficient collateral consequence to preserve a live controversy even after deportation of the prisoner); *Max-George v. Reno,*

205 F.3d 194, 196 (5th Cir. 2000) (same), *vacated on other grounds,* 533 U.S. 945, 121 S. Ct. 2585 (2001); *Smith v. Ashcroft,* 295 F.3d 425, 428 (4th Cir. 2002) (same);*Tapia-Garcia v. INS,* 237 F.3d 1216, 1218 (10th Cir. 2001) (permanent bar to readmission for aggravated felon is collateral consequence); *Steele v. Blackman, INS,* 236 F.3d 130, 134 n. 4 (3d Cir. 2001) (same).

Indeed, not only would Mr. Ullah be ineligible for legal admission to this country, but it also would be reasonable to assume that any person designated as an enemy combatant would have his name on a "no-fly list," a legal restriction severely hampering his ability to board an airplane or to otherwise travel unimpeded.

Respondents' pleading also misconstrues, and inappropriately attempts to narrow, the range of collateral consequences that warrant continuation of a habeas corpus action. The mootness doctrine requires dismissal of the action only if the petitioner no longer has "a substantial stake in the outcome" such that there is no longer an actual case or controversy. *Spencer v. Kemna,* 523 U.S. 1, 8-12 (1998).  Moreover, the petition is not expected, in advance, to demonstrate all of the possible consequences flowing from a government action that has detained him:  the "mere possibility" that there will be collateral consequences can be enough to preserve  the case or controversy. *Sibron v. State of New York*, 392 U.S. 40, 55, 57 (1968) ("a criminal case is moot only if it is shown that there is no possibility that any collateral legal consequences will be imposed on the basis of the challenged conviction").

Nor are Respondents correct that reputation or impugnment of character is inappropriate to consider.  In *Sibron*, the Supreme Court considered the situation where

a habeas petitioner might suffer damage to reputation from a challenged conviction, despite the fact that he already had other convictions on his record:

> we see no relevance in the fact that Sibron was a multiple offender.... A judge or a jury faced with questions of character, like a sentencing judge, may be inclined to forgive or at least discount a limited number of minor transgressions, particularly if they occurred at some time in the relatively distant past. It is impossible for this Court to say at what point the number of convictions on a man's record renders his reputation irredeemable. And even if we believed that an individual had reached that point, it would be impossible for us to say that he had no interest in beginning the process of redemption with the particular case sought to be adjudicated.

*Sibron*, 392 U.S. at 56.

Respondents finally complain that Mr. Ullah attempts to place some burden on them to show the absence of collateral consequences. Opposition at 8. They are correct. Mr. Ullah does ask Respondents to bear some burden, at least to the extent of permitting inquiry into what knowledge or intention they have regarding the consequences of being designated an enemy combatant. This is entirely appropriate. Having created the category of "enemy combatant," a term and category heretofore unknown, Respondents can hardly complain about reasonable inquiry by this Court, or by Mr. Ullah, into exactly what Respondents intend for the future of persons branded with that new label.

Mr. Ullah's habeas corpus petition not only seeks his release from unlawful detention, but it also steadfastly has proclaimed his innocence and challenged the wrongfulness of Respondents' designation of him as an "enemy combatant." *See* CR 1 (*pro se* petition). Based on the evidence currently before this Court, Mr. Ullah should no longer be designated as an "enemy combatant." Respondents' relinquishment of custody or control over him simply does not address or resolve the fact that he is "suffering, and will continue to suffer, serious disabilities because of the law's complexities and not

because of his fault, if his claim that he has been illegally [detained and wrongfully designated as an enemy combatant] is meritorious." *Carafas*, 391 U.S. at 239.

## CONCLUSION

Mr. Ullah's whereabouts are unknown to his counsel and to the Court. Mere declarations that he has been transferred are not sufficient to establish that he is no longer within the jurisdiction of this Court. If Respondents persist in seeking dismissal of this action, they should be made to provide complete information about his whereabouts and the circumstances of who has control and custody of him, and the Court needs to accept briefing about the legal significance of those circumstances.

Even if it should be determined, following Respondents' provision of that information and subsequent briefing, that Mr. Ullah is beyond the jurisdiction of the Court, this Court should decline to dismiss the petition so long as Respondents continue to label Mr. Ullah an enemy combatant. Having created that category, smeared Mr. Ullah with that label, and imprisoned him for five years, despite his protestations of innocence and without affording him any meaningful process, Respondents should at least be expected to elucidate for the Court and counsel the future disabilities they intend for those, like Mr. Ullah, whom they have stained with their broad brush.

Respectfully submitted on September 10, 2007.

/s/ Ruben L. Iñiguez_____
Ruben L. Iñiguez
Assistant Federal Public Defender

/s/ Bryan E. Lessley_____
Bryan E. Lessley
Assistant Federal Public Defender

# EXHIBIT A

Slate

CARBON IN LOVE

JURISPRUDENCE

# Custody Dispute

Why is the U.S. stashing detainees at Policharki prison in Afghanistan?

By Eric Lewis

Posted Thursday, Aug. 16, 2007, at 12:16 PM ET

---

First Guantanamo, then Abu Ghraib, and now add Afghanistan's Policharki prison to the list of hellish U.S.-run prisons around the world. The United States has moved to Policharki Afghan detainees who have begun to challenge their confinement and treatment in American courts. The government claims that the prison is under the sovereign authority of Afghanistan and so lies outside U.S command—and beyond the reach of our courts. Yet these prisoners are being held in a special "national defense" wing built by our government and staffed by American jailers and interrogators. The Policharki transfers are the latest example of the Bush administration's long-running effort to evade judicial review of the thousands of detentions that have resulted from the war on terror.

Built in the 1970s, Policharki was a notorious torture center during the following decade of Soviet domination. Directed by their Soviet masters, Afghan interrogators administered a protocol of psychological and physical torture: sleep deprivation, electric shocks, cigarette burns, threatened sexual violation. Nearly 17,000 Afghans were murdered in night executions at the prison. Now the United States is using Policharki as a long-term detention center for detainees previously held at Bagram, a U.S. Air Force base in Afghanistan. In recent months, more than 80 prisoners at Bagram have been sent to Policharki.

I have a professional interest in these detainees: I represent Ruzatullah (like many Afghans, he has only one name), an Afghan farmer who was taken from his home more than two and a half years ago by U.S. troops, according to his brother, who was also captured but later released. Ruzatullah was brought to Bagram, where he has been held without charges, without a hearing, and without access to counsel.

The Air Force base has been the holding site for thousands of detainees, including many of those later sent to Guantanamo Bay. Approximately 500 remain at Bagram, a place of greater violence and abuse than Guantanamo. In 2002, two prisoners were tortured to death by American interrogators at the prison. As Tim Golden reported in a *New York Times* series in 2005 (article purchase required), conditions remain primitive, and processes for determining who is being held without basis are virtually nonexistent. The U.S. government has conceded that it does not have the resources to determine in a timely way whether individual detainees are being properly held. And Bagram lacks even the unsatisfactory Combatant Status Review Tribunals used at Guantanamo. Determinations of combatant status are not made through any evidentiary hearing, but rather by the commanding officer at Bagram, who has discretion whether to gather evidence, hear witnesses, or allow the detainee to present his story.

Given these conditions, the U.S. authorities are concerned that the Supreme Court's decisions granting detainees some rights to challenge their confinement at Guantanamo could spell legal trouble at Bagram. We filed a petition for habeas corpus on Ruzatullah's behalf, asking for a judicial hearing to determine whether there was any basis for his continued detention at Bagram. Rather than litigate that issue, the government moved him to Policharki in early June. Government lawyers then notified the court that the United States had "relinquished all

legal and physical custody" of Ruzatullah to the Afghan government. Move on, court—nothing to see here.

But the government failed to tell the court that Ruzatullah was taken directly to Policharki's new "national defense" wing. Earlier this month, Ruzatullah's family visited him there. American trainers operate the prison from a central command center out of sight of the prisoners. Our military acknowledges that it oversees operations and controls all access and security. Ruzatullah's young son tried to comfort his father, but according to other family members, Ruzatullah was angry and nonresponsive, showing the signs of long-term confinement and torture. He told his brother that he has lost hope that anyone will listen to his pleas.

And indeed, no Afghan court appears to have jurisdiction over Policharki's national defense wing. Nor have basic rights in Afghan law been afforded to the detainees there. Like our Constitution, the Afghan Constitution provides a right to counsel from the time of arrest, yet to date no Afghan detainee at Policharki has been permitted to see a lawyer, despite requests by family members and Afghan human rights groups.

Recently, in the case *Abu Ali v. Ashcroft*, a Republican-appointed district judge rejected the government's position that the court lacked jurisdiction over a prisoner held in a Saudi prison who was incarcerated at the behest and supervision of the United States. Judge John D. Bates wrote that he could not find any basis for not hearing the detainee's petition "merely because the executive is allegedly working through the intermediary of a foreign ally."

It's a promising ruling. And at Guantanamo, the government's efforts to evade the jurisdiction of American courts suffered setbacks in the last three years, in the cases *Rasul* and *Hamdan*. In the next year, the Supreme Court may definitively decide the scope of constitutional protection for foreign detainees in the upcoming cases *Boumediene* and *Al-Odah*. What is not clear from the relatively cautious rulings thus far is whether the court will base its Guantanamo rulings on the special status of the base, given its virtual American sovereignty, or instead affirm that the Constitution imposes absolute limits on U.S. officials to violate the fundamental rights of those whom they detain, wherever they may do so. The litigation over treatment at Bagram directly poses this question. And so rather than risk an adverse ruling, the administration is pretending to subcontract detention to a weak and compliant Kabul—while in truth American authorities run the show. The courts should not allow this ruse.

*Eric Lewis is a Washington, D.C., lawyer who represents detainees both at Guantanamo and in Afghanistan.*

Article URL: http://www.slate.com/id/2172334/

Copyright 2007 Washingtonpost.Newsweek Interactive Co. LLC